**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\*\*\*

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

TERRENCE HODGKIN,

        Defendant.

Case No. 2:16-cr-00355-KJD-VCF-1

**REPORT & RECOMMENDATION**

MOTION TO SUPPRESS (ECF NO. 18)

      This case involves the Government's prosecution of Defendant Terrence Hodgkin for felony possession of a gun under 18 U.S.C. §§ 922(g)(1), 924(a)(2). Before the Court is Hodgkin's Motion to Suppress Evidence Due to Fourth Amendment Violations. (ECF No. 18). The Government filed a Response to Defendant's Motion to Suppress. (ECF No. 26). Hodgkin filed a Reply. (ECF No. 26). The Court held an evidentiary hearing on May 5, 2017. (ECF No. 30). At the close of the hearing, the Court ordered simultaneous briefing on the applicability, if any, of *Utah v. Strieff*, 136 S. Ct. 2056 (2016), to the facts of this case. (*Id.*). The Government and Hodgkin timely submitted supplemental briefing. (ECF Nos. 34, 35). The Court has reviewed the briefs. For the reasons stated below, Hodgkin's Motion to Suppress should be denied.

## I. Background

      Shortly after 1 p.m. on Friday, September 23, 2016, Las Vegas Metropolitan Police Department ("Metro") Officers Sam Diaz and Brian Ballinger were driving south on Nellis Boulevard in their patrol car. *See* Evidentiary Hearing, ECF No. 30 (May 5, 2017). As Officer Diaz and Officer Ballinger were driving, they observed a white 2011 Chevrolet Malibu driving in the opposite direction with a front license plate frame—but no front license plate. *Id.* Driving without a front license plate when a vehicle is

1

manufactured to include a bracket or device to display and secure a front license plate violates Nevada law. *See* Evidentiary Hearing, ECF No. 30 (May 5, 2017); *see also* Nev. Rev. Stat. 482.275. For this reason, the Metro Officers decided to conduct a traffic stop. *Id*. So, after the Malibu passed by, Officer Diaz made a U-turn in the direction of the Malibu. While Officer Diaz was making that U-turn, the Malibu promptly turned right from Nellis Boulevard onto Billman Avenue and accelerated at a high rate of speed. *Id*. By the time Officer Diaz turned right onto Billman Avenue, the Malibu had zoomed down Billman and—to the Officers surprise—was already turning left at the stop sign onto Sacks Drive. *Id*. The Malibu did not come to a full and complete stop at the stop sign. Similarly, just as Officer Diaz turned onto Sacks Drive, the Malibu was turning right from Sacks onto Sheppard Drive before making another right onto Shepard Circle—a cul-de-sac surrounded by homes. *Id*. The Metro Officers tried to close the distance between them and the Malibu. *Id*. They were always 200-400 feet behind the Malibu, however, as it wound its way through the streets of the residential neighborhood. *Id*. While pursuing the Malibu, Officer Diaz did not see whether the Malibu had a temporary tag or license plate in the back. *Id*.

After the Malibu entered into the Shepard Circle cul-de-sac, it turned around and faced the entrance of the cul-de-sac—it had no place to go. *Id*. The Metro Officers entered the cul-de-sac, coming face to face with the Malibu. *Id*. The Metro Officers then conducted a traffic stop, telling the driver of the Malibu to exit the car and step in front of their patrol car. *Id*. The Malibu driver complied, parking the Malibu alongside the street curb in front of a home located at 5204 Shepard Circle. *Id*. A portion of the back of the Malibu stuck out in front of the driveway entrance to 5204 Shepard Circle.

After stepping in front of the Metro Officers' patrol car, the driver of the Malibu identified himself as Terrence Hodgkin and provided his driver's license to the Metro Officers. *Id*. The Metro Officers at this point observed that Hodgkin's car had a valid temporary tag in the rear license plate frame. *Id*. The Malibu had been validly registered, but it had no insurance. *See* Evidentiary Hearing, ECF No. 30 (May

5, 2017). Officer Schmitt and Officer Marquez then arrived to assist. *Id.* Officer Schmitt conducted a records check and learned that Hodgkin had a municipal court warrant for speeding and a justice court warrant for operating an unregistered vehicle. *Id.* The Metro Officers arrested Hodgkin for those outstanding warrants. *Id.*

After arresting Hodgkin, the Metro Officers decided to tow his Malibu for two reasons under the Metro Policy for Impounding Motor Vehicles ("Metro Policy"). First, under Metro Policy Section 5/204.06(10), the Malibu had no insurance. Driving without insurance violates Nevada law. Second, under Metro Policy Section 5/204.06(12), the Malibu did not have a licensed driver because Officers arrested Hodgkin. The Malibu was not legally parked—it was partially blocking the driveway of the 5204 Shepard Circle residence. *Id.* Metro Officers did not give Hodgkin an opportunity to contact a friend or relative to pick up his vehicle. *Id.* They did not allow Hodgkin to do so because of officer safety issues from allowing Hodgkin to call unknown persons on his phone. *Id.* Also, with no insurance and only a temporary tag, Officers could not identify any co-owners of the Malibu who could come and pick it up.

Prior to towing the Malibu, the Metro Officers conducted an inventory search. *Id.* During the inventory search of the Malibu, Officer Marquez discovered a Glock handgun, ammo, and $600 cash inside a backpack located in the trunk. *Id.* The Metro Officers determined that the handgun was stolen and that Hodgkin had multiple felony convictions. *Id.* Officer Diaz then advised Hodgkin of his *Miranda* rights to which Hodgkin responded that he understood. Hodgkin then stated to Metro Officers that he received the firearm from an unknown person and that the gun was for his own protection. He also stated that his fingerprints would be found on the gun.

Hodgkin was initially charged in state court for possession of a firearm by a prohibited person. *See* ECF No. 18 at 4. On December 6, 2016, a federal grand jury returned a one-count indictment against

3

Hodgkin, charging him with felon in possession of a firearm under 18 U.S.C. §§ 922(g)(1), 924(a)(2). *See* ECF No. 1. Shortly after, the State of Nevada dismissed its case against Hodgkin.

On March 13, 2017, Hodgkin filed the instant motion to suppress the gun, bullets, and all incriminatory statements obtained from the Metro Officers' search and seizure of his car because (1) the traffic stop was not supported by reasonable suspicion, and (2) the Metro Officers' impoundment and inventory search of Hodgkin's vehicle was not justified by the community caretaker function.

## II. Discussion

### A. Whether Metro Officers Lacked Reasonable Suspicion to Stop Hodgkin's Car

The 54 well-known words that comprise the Fourth Amendment need not be repeated. *See* U.S. Const. amend. IV. The general rule is that the Fourth Amendment makes warrantless searches and seizures unreasonable as a matter of law. *See United States v. Cervantes*, 703 F.3d 1135, 1138-39 (9th Cir. 2012) (citing *Katz v. United States*, 389 U.S. 347, 357 (1967)). But traffic stops provide one of the "few specifically established and well-delineated exceptions" to this rule. *Id*.

A police officer may stop a car without a warrant, and thereby seize its passengers, if there is reasonable suspicion that criminal activity may be afoot or that a traffic violation has occurred. *See Heien v. North Carolina*, 135 S. Ct. 530, 536 (2014) ("A traffic stop for a suspected violation of law is a "seizure" of the occupants of the vehicle and therefore must be conducted in accordance with the Fourth Amendment"); *see also Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977) (stating that a police officer who personally observes a traffic violation has probable cause to stop the vehicle and offending driver); *United States v. Fowlkes*, 804 F.3d 954, 971 (9th Cir. 2015).

Reasonable suspicion is a low standard: it only requires a police officer to "be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" a stop. *See Terry v. Ohio*, 392 U.S. 1, 21 (1968); *see also United States v. King*, 244 F.3d 736,

4

738 (9th Cir. 2001) ("Reasonable suspicion exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for particularized suspicion"). This standard is less demanding than the probable cause standard. *See United States v. Tiong*, 224 F.3d 1136, 1140 (9th Cir. 2000) ("The quantum of proof needed for reasonable suspicion is less than a preponderance of evidence, and less than probable cause"); *see also United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013) ("The reasonable-suspicion standard is not a particularly high threshold to reach. Although … a mere hunch is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard"). Reasonable suspicion is a "commonsense, nontechnical conception[] that deal[s] with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' " *Valdes-Vega*, 738 F.3d at 1078. Protection of the public safety justifies such an approach. Also, a police officer's "actual motivation" or "[s]ubjective intentions" are not relevant to the constitutionality of a stop. *See Whren v. United States*, 517 U.S. 806, 813-14 (1996); *see also United States v. Ibarra*, 345 F.3d 711, 714 (9th Cir. 2003) (holding that the constitutional reasonableness of traffic stops and subsequent searches depends on the objective conditions obtaining during the search, not the subjective intentions of the officer).

When reviewing an officer's reasonable suspicion, courts must look at the totality of the circumstances. *See United States v. Arvizu*, 534 U.S. 266, 278 (2002); *see also Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016) ("Suppression of evidence ... has always been our last resort, not our first impulse") (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)). This process "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Id*. at 273; *United States v. Lopez-Soto*, 205 F.3d 1101, 1105 (9th Cir. 2000).

A police officer's reasonable but mistaken belief regarding the facts establishing reasonable suspicion does not offend the Fourth Amendment. As the text indicates, "the ultimate touchstone of the Fourth Amendment is reasonableness." *See Heien*, 135 S. Ct. at 536; *see also United States v. Brignoni–Ponce*, 422 U.S. 873, 881 (1975) ("The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape") (quoting *Adams v. Williams*, 407 U.S. 143, 145 (1972)). To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of police officers, giving them "fair leeway for enforcing the law in the community's protection." *Id.* (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)). The Supreme Court, and the Ninth Circuit, have recognized that searches and seizures based on mistakes of fact can be reasonable. *Id.* For example, an officer's correct understanding of the law, together with a good-faith error regarding the facts, can establish reasonable suspicion. *See King*, 244 F.3d at 738; *see also United States v. Twilley*, 222 F.3d 1092, 1096 n. 1 (9th Cir. 2000) ("A factual belief that is mistaken, but held reasonably and in good faith, can provide reasonable suspicion for a traffic stop").

Based on the standards articulated above, Officer Diaz and Officer Ballinger's traffic stop of Hodgkin did not violate the Fourth Amendment. The traffic stop was based on a reasonable suspicion that a traffic violation had occurred. Officer Diaz and Officer Ballinger were driving southbound down a street when they saw a vehicle driving northbound right toward them with a black frame to display and secure a front license plate, but with no front license plate. *See* Evidentiary Hearing, ECF No. 30 (May 5, 2017). That caught the Metro Officers' attention because Nevada law requires vehicles to have license plates

attached in the front and rear.[1]  Because Officer Diaz and Officer Ballinger perceived that a traffic violation had occurred, they promptly turned their patrol car around and pursued the Malibu. *See United States v. Choudhry*, 461 F.3d 1097, 1100 (9th Cir. 2006) ("A traffic violation alone is sufficient to establish reasonable suspicion").  But after the Malibu passed their patrol car, the Malibu accelerated into the residential neighborhood in an attempt to lose or flee from the Officers. *See* Evidentiary Hearing, ECF No. 30 (May 5, 2017).

The perceived traffic violation for driving without front license plates combined with Hodgkin's flight formed the basis for the Officers' particularized suspicion. *See King*, 244 F.3d at 738.  To be sure, unprovoked flight is not, by itself, sufficient to justify a temporary investigative stop. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). Evasive behavior is, however, a pertinent factor in determining reasonable suspicion. *Id*.; *Brignoni-Ponce*, 422 U.S. at 885 ("[E]rratic driving or obvious attempts to evade officers can support a reasonable suspicion"). Headlong flight is the consummate act of evasion. While it is not necessarily indicative of wrongdoing, it is certainly suggestive of such. *Id*. Flight, by its very nature, is not "going about one's business"; in fact, it is just the opposite. *Id*. There are innocent reasons for flight from police and that, therefore, flight is not necessarily indicative of ongoing criminal

---

[1] NEV. REV. STAT. 482.275(1)-(2) states:

> 1. The license plates for a motor vehicle … must be attached thereto, one in the rear and, except as otherwise provided in subsection 2, one in the front. The license plate issued for all other vehicles required to be registered must be attached to the rear of the vehicle. The license plates must be so displayed during the current calendar year or registration period.
>
> 2. If the motor vehicle was not manufactured to include a bracket, device or other contrivance to display and secure a front license plate, and if the manufacturer of the motor vehicle provided no other means or method by which a front license plate may be displayed upon and secured to the motor vehicle:
>    a) One license plate must be attached to the motor vehicle in the rear; and
>    b) The other license plate may, at the option of the owner of the vehicle, be attached to the motor vehicle in the front.

activity. Although this fact is undoubtedly true, it does not establish a violation of the Fourth Amendment. *Id*.

In any event, Hodgkin's flight from the Metro Officers was not the sole reason why Officer Diaz and Officer Ballinger conducted a traffic stop of Hodgkin. Hodgkin's attempt to flee from Police supplemented the Metro Officers' initial belief that Hodgkin had violated Nevada law for driving without front license plates. *See Wardlow*, 528 U.S. at 125 ("reasonable suspicion must be based on commonsense judgments and inferences about human behavior"). The Court finds that Officer Diaz and Officer Ballinger had reasonable suspicion to conduct a traffic stop of Hodgkin.

Hodgkin argues that he did not have a license plate because the Malibu had not yet been registered; instead, his car displayed a valid temporary dealer tag affixed to the rear of the vehicle. *See* ECF No. 26 at 2. Hodgkin further argues that when the Metro Officers followed behind his Malibu the temporary tag should have been clearly visible to the officers. *Id*. The Malibu did have a valid temporary tag affixed to its rear license plate frame. *See* Evidentiary Hearing, ECF No. 30 (May 5, 2017). But Officer Diaz and Officer Ballinger never saw the temporary tag until they had stopped and inspected the Malibu in the Shepard Circle cul-de-sac. *Id*.

When Officer Diaz and Officer Ballinger first saw Hodgkin driving his Malibu, they only saw the front of the Malibu as it drove past them in the opposite direction. At this point, they had only observed that the Malibu had no front license plate, which violated Nevada law. So, they decided to conduct a traffic stop, but were unable to close the distance with the Malibu. Officer Diaz was always 200-400 feet behind and did not see the temporary tag on the back of the Malibu's rear license plate frame. Every time the Metro Officers turned onto a street in pursuit of the Malibu, Hodgkin was quickly turning onto a different street trying to lose the Officers. Even when Hodgkin stopped his Malibu in the Shepard Circle cul-de sac, the Malibu was face to face with the Metro Officers' patrol car. Only after detaining Hodgkin

8

and running a records check on him did the Officers observe that the Malibu had a valid temporary tag in the rear license plate frame. A police officer's reasonable but mistaken belief regarding the facts establishing reasonable suspicion does not offend the Fourth Amendment. The ultimate touchstone of the Fourth Amendment is "reasonableness," not perfection. *See Heien*, 135 S. Ct. at 536; *see also King*, 244 F.3d at 738.

Based on the totality of circumstances, Officer Diaz and Officer Ballinger had a reasonable and articulable suspicion to conduct a traffic stop based on their perception that Hodgkin was driving without a front license plate and Hodgkin's attempts to "lose" the Officers by accelerating into the residential neighborhood. As a result, the Metro Officers investigative stop was justified.

**B.** *Utah v. Strieff*

Had the analysis in the preceding section II(A) resulted in a conclusion that the investigation was not justified, under *Utah v. Strieff*, the discovery of Hodgkin's outstanding warrants sufficiently attenuated the unlawful stop. *See Utah v. Strieff*, 136 S. Ct. 2056 (2016).

*Strieff* arose from police surveillance of a Salt Lake City residence based on an anonymous tip of "narcotics activity." *Id.* at 2059-2060. While watching the home, Narcotics Detective Douglas Fackrell observed frequent visitors who would leave a few minutes after arriving at the house. *Id.* This raised Fackrell's suspicion that the occupants were dealing drugs. *Id.* Edward Strieff was one of those visitors. *Id.* After Strieff left the house, Officer Fackrell detained Strieff at a nearby parking lot. *Id.* Officer Fackrell requested Strieff's identification and relayed Strieff's information to a police dispatcher. *Id.* Strieff had an outstanding arrest warrant for a traffic violation. *Id.* Officer Fackrell then arrested Strieff pursuant to that warrant. *Id.* When Officer Fackrell searched Strieff incident to the arrest, he discovered illegal drugs. Strieff moved to suppress the evidence as inadmissible fruit of the unlawful investigatory stop.

9

The question for the Supreme Court was whether the discovery of a valid existing warrant was sufficient to break the causal chain between an unlawful stop and the discovery of evidence. *See Strieff*, 136 S. Ct. at 2061. In a five-to-three decision, Justice Thomas held that a law enforcement officer's discovery of a valid, pre-existing, and untainted arrest warrant attenuated the connection between the officer's purportedly unlawful stop and the drug-related evidence seized from the defendant incident to arrest, and thus, that evidence was admissible at trial.

Justice Thomas began with a brief overview of the Supreme Court's exclusionary rule jurisprudence:

> [T]he exclusionary rule encompasses both the "primary evidence obtained as a direct result of an illegal search or seizure" and, relevant here, "evidence later discovered and found to be derivative of an illegality," the so-called " 'fruit of the poisonous tree.' " *Segura v. United States*, 468 U.S. 796, 804, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984). But the significant costs of this rule have led us to deem it "applicable only … where its deterrence benefits outweigh its substantial social costs." *Hudson v. Michigan*, 547 U.S. 586, 591, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006) (internal quotation marks omitted). "Suppression of evidence … has always been our last resort, not our first impulse." *Ibid*.
>
> We have accordingly recognized several exceptions to the rule. Three of these exceptions involve the causal relationship between the unconstitutional act and the discovery of evidence … Third, and at issue here, is the attenuation doctrine: Evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that "the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained." *Hudson*, *supra*, at 593, 126 S.Ct. 2159.

*Id*. To guide the analysis, Justice Thomas turned to three factors from a prior Supreme Court decision, *Brown v. Illinois*, 422 U.S. 590 (1975).

Under *Brown*, the application of the attenuation doctrine involves balancing three factors: (1) the temporal proximity between the unlawful stop and the discovery of evidence; (2) the presence of

intervening circumstances; and (3) the "purpose and flagrancy of the official misconduct." *See Strieff*, 136 S. Ct. at 2062. The first factor—i.e., temporal proximity—favored Strieff because "Officer Fackrell discovered drug contraband on Strieff's person only minutes after the illegal stop." *Id*. The Court found that the second factor, however, strongly favored the State. *Id*. Relying on *Segura v. United States*, 468 U.S. 796 (1984), which applied the independent source doctrine, Justice Thomas found that the principle in *Segura* that the "existence of a valid warrant favors finding that the connection between unlawful conduct and the discovery of evidence is 'sufficiently attenuated to dissipate the taint'" applied in *Strieff*. *Id*. Because the warrant "predated Officer Fackrell's investigation, and … was entirely unconnected with the stop," Fackrell's arrest of Strieff "was independently compelled by the pre-existing warrant." *Id*. at 2062-2063. The third factor also favored the State because "Officer Fackrell was at most negligent." The Supreme Court held that the exclusionary rule did not apply. The "unlawful stop was sufficiently attenuated by the pre-existing arrest warrant" and, therefore, the evidence discovered on Strieff's person was admissible.

As a preliminary matter, the Court acknowledges that *Strieff* involved an arrest warrant attenuating the connection between an unlawful stop and the evidence seized on Strieff's person incident to arrest. In the instant matter, Metro Officers seized evidence pursuant to an inventory search of a vehicle conducted prior to it being towed. Hodgkin persuasively argues that unlike in *Strieff* where it was "undisputedly lawful" for the officer to search Strieff once he was authorized to arrest him, here, the lawfulness of the search of Hodgkin's Malibu is disputed. The Court, however, disagrees with Hodgkin's argument that to apply *Strieff* to the facts of the instant case would extend it beyond its intended purpose. *Strieff* held that a valid arrest warrant is a sufficient intervening event to attenuate an unlawful stop. Even so, here, the Government still has the burden to prove that a search of the vehicle was conducted pursuant to a valid

11

warrant or falls within an exception to the warrant requirement. Indeed, this case involves the impound and search of Hodgkin's Malibu conducted pursuant to Metro Policy.

Balancing the three *Brown* factors in this case, and assuming, *arguendo*, that the initial traffic stop was unlawful, the Court concludes that the discovery of Hodgkin's outstanding state warrants sufficiently attenuated the unlawful traffic stop from the subsequent discovery of evidence. Put differently, Hodgkin's warrants broke the causal chain between the unlawful stop and any impact that unlawful stop would have had on the Metro Officers' discovery of evidence in Hodgkin's vehicle prior to it being towed.

The temporal proximity factor favors suppression in that the search and discovery of evidence occurred within mere minutes after the Metro Officers initially stopped Hodgkin. Generally, a time interval of less than two hours is considered too close in time for attenuation to occur. *See Brown*, 422 U.S. at 604 (concluding that a time span of "less than two hours" between the unconstitutional arrest and the confession was too short an interval).

For the second factor, however, the outstanding warrants were intervening events wholly unrelated to the unlawfulness of the initial stop. The warrants were valid, they predated Officer Diaz and Officer Ballinger's investigatory stop and investigation of Hodgkin, and they were entirely unconnected with the stop.

The third factor—the "purpose and flagrancy of the official misconduct"—is crucial because it goes to the heart of the rationale for the existence of the exclusionary rule: to deter illegal police conduct by depriving police and prosecutors of the fruits of an illegal search. "The third factor of the attenuation doctrine reflects that rationale by favoring exclusion only when the police misconduct is most in need of deterrence—that is, when it is purposeful or flagrant." *Strieff*, 136 S. Ct. at 2063. The Court is persuaded that Officer Diaz and Officer Ballinger did not engage in purposeful or flagrant misconduct. Officer Diaz saw Hodgkin driving a vehicle with no front license plate. Because state law generally requires front and

rear license plates, Officer Diaz decided to conduct a traffic stop. While Hodgkin's Malibu had a valid temporary tag affixed to its rear license plate frame, Officer Diaz was always 200-400 feet behind the Malibu as Hodgkin quickly maneuvered onto different streets trying to lose the Officers. But this error hardly rises to a purposeful or flagrant violation of Hodgkin's Fourth Amendment rights.

Applying these factors, the Court finds that the unlawful stop was sufficiently attenuated by the pre-existing warrants. Although the illegal stop was close in time to Hodgkin's arrest, that consideration is outweighed by two factors supporting the Government.

### C. Whether Metro Officers' Impoundment and Inventory Search of Hodgkin's Malibu was Justified Under Metro Policy and the Community Caretaking Doctrine

Hodgkin argues that even if the Court finds that the Metro Officers had reasonable suspicion to conduct the traffic stop, the Metro Officers' impound and search of the Malibu was unconstitutional because the impound (1) was not justified under the community caretaking doctrine and (2) did not comply with Metro's standardized procedures and written policies for impounding vehicles. *See* ECF Nos. 18 at 5-6; 26 at 3-4. The Court disagrees.

Impounding an automobile by a law enforcement officer is a seizure under the Fourth Amendment. *See United States v. Torres*, 828 F.3d 1113, 1118 (9th Cir. 2016). The Fourth Amendment forbids warrantless searches and seizures by law enforcement officers as "per se unreasonable" subject to few exceptions. *Id*. Under the "community caretaking" doctrine, law enforcement officers may, without a warrant, impound and search a vehicle if (1) they do so in accordance with the standardized procedures and written policies of the local police department and (2) in furtherance of a community caretaking purpose, including promoting public safety or the efficient movement or flow of vehicle traffic. *Id.*; *Miranda v. City of Cornelius*, 429 F.3d 858, 864 (9th Cir. 2005) ("Whether an impoundment is warranted under this community caretaking doctrine depends on the location of the vehicle and the police officers'

duty to prevent it from creating a hazard to other drivers or being a target for vandalism or theft"). Once Police legally impound a vehicle, they may conduct an inventory search, as long as it conforms to the standard procedures of the local police department. *See Florida v. Wells*, 495 U.S. 1, 4 (1990) ("[A]n inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence"). The burden to show that a vehicle's impoundment and search are justified under an exception to the warrant requirement is on the Government. *See Torres*, 828 F.3d at 1118.

The Court finds that the Government has met its burden. The Government argues that Metro Officers fulfilled their community caretaking obligation by protecting Hodgkin's uninsured and illegally parked vehicle that was located in a high crime neighborhood. *See* ECF No. 23 at 8. The Government has not offered any proof, however, as to whether the residential neighborhood was a "high crime area." Neither the Arrest Report, nor testimony at the evidentiary hearing established that the residential neighborhood was a high crime area. The Metro Officers' bodycam footage also failed to show whether the neighborhood was a high crime area.

That said, Hodgkin's Malibu had no insurance and was illegally parked. The Malibu constituted a traffic hazard because it partially impeded the egress and ingress to the 5204 Shepard Circle residence. A community caretaking purpose includes promoting the efficient movement or flow of vehicle traffic. *See Torres*, 828 F.3d at 1118; *Miranda*, 429 F.3d at 864 ("Whether an impoundment is warranted under this community caretaking doctrine depends on the location of the vehicle and the police officers' duty to prevent it from creating a hazard to other drivers …"); *see also S. Dakota v. Opperman*, 428 U.S. 364, 369 (1976) ("The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge"). Metro Officers satisfied their community caretaking obligation by removing the Malibu from the residential neighborhood.

The Government claims that the Metro Officers impounded and searched the Malibu in accordance with Metro Policy. Metro Policy details 12 circumstances that justify impounding vehicles. *See* ECF No. 18-2. Only two of those 12 are at issue here.

Metro Policy Section 5/204.06(10) authorizes impoundment "[i]n other circumstances, in accordance with the prescribed authority and conditions defined in the Las Vegas City Code, Clark County Ordinances, and Nevada Revised Statutes." *Id.* at 3. The Government asserts that the impound was justified under NEV. REV. STAT. 485.187(b).[2] Hodgkin stated to Metro Officers that his Malibu had no insurance. Nevada law requires a vehicle to be insured to be operated. *See* NEV. REV. STAT. 485.187(b). Thus, under Nevada law, the Malibu could not have been legally operated. But neither the Government, nor Officer Diaz at the Evidentiary Hearing cited any city code, county ordinance, or Nevada Revised Statue that *authorized the impoundment* of Hodgkin's vehicle for failing to provide proof of insurance. *See United States v. Beck*, No. 2:12-CR-00362-APG, 2015 WL 74125, at *14 (D. Nev. Jan. 6, 2015) ("[n]either officer testified about any city code, county ordinance, or Nevada Revised Statue that authorized the impoundment of Beck's vehicle for failing to display a valid license plate, or provide proof of insurance and registration. Similarly, the government's response does not cite any applicable code, ordinance or statute authorizing impoundment"). NEV. REV. STAT. 485.187(b) does not authorize impoundment specifically.

Metro Policy Section 5/204.06(12) authorizes impoundment "[i]f there is not a licensed driver in the vehicle and it is not legally parked." *See* ECF No. 18-2. The Government contends that Hodgkin "had been arrested, no other licensed drivers were present in the vehicle, and Officer Diaz's determined that

---

[2] *See* NEV. REV. STAT. 485.187(b) ("Except as otherwise provided in subsection 5, the owner of a motor vehicle shall not … Operate or knowingly permit the operation of the motor vehicle without having evidence of insurance of the operator or the vehicle in the vehicle").

15

the vehicle was parked illegally." *See* ECF No. 23 at 7. Prior to impounding and searching the Malibu, the Metro Officers had arrested Hodgkin and placed him into custody. There were no other persons driving with Hodgkin in the Malibu. And, as discussed above, the Malibu was illegally parked—a portion of the back of the Malibu blocked the driveway of the home located at 5204 Shepard Circle. Thus, under Metro Policy Section 5/204.06(12), the Metro Officers' impounding of Hodgkin's Malibu was authorized because there was no licensed driver in the vehicle and it was not legally parked.[3]

ACCORDINGLY, and for good cause shown.

IT IS HEREBY RECOMMENDED that Hodgkin's Motion to Suppress (ECF No. 18) be DENIED.

IT IS SO RECOMMENDED.

DATED this 24th day of May, 2017.

_____
CAM FERENBACH
UNITED STATES MAGISTRATE JUDGE

---

[3] Hodgkin argues that even though he was arrested, he was physically and mentally able to turn the car over to the custody and care of a relative or friend. *See* Metro Policy Section 5/204.06(1) ("Whenever a driver is arrested and is no physical or mental condition to turn the vehicle over to the custody and care of a relative or friend … Such circumstances will be explained the Vehicle Impound Report or the Arrest Report"). Metro Officers did not give Hodgkin the opportunity to turn the car over to the custody and care of a relative or friend. However, the Court finds that the actions of the Metro Officers were in accordance with Metro Policy Section 5/204.06(12).

16